Slip Op. 20-152

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **RISEN ENERGY CO., LTD.,** | |
| **Plaintiff,** | |
| **SUNPOWER MANUFACTURING OREGON, LLC,** | |
| **Consolidated Plaintiff,** | |
| and | |
| **SHANGHAI BYD CO., LTD. ET AL.,** | |
| **Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| v. | **Consol. Court No. 19-00153**<br>**PUBLIC VERSION** |
| **UNITED STATES,** | |
| **Defendant,** | |
| and | |
| **SUNPOWER MANUFACTURING OREGON, LLC ET AL.,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the fifth administrative review of the antidumping duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules from the People's Republic of China.]

Dated: October 30, 2020

**PUBLIC VERSION**

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff and consolidated defendant-intervenor Risen Energy Co. Ltd.  Also on the briefs were Alexandra H. Salzman and J. Kevin Horgan.

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, DC, for consolidated plaintiff and defendant-intervenor SunPower Manufacturing Oregon, LLC.  Also on the briefs were Laura El-Sabaawi and Enbar Toledano.

Craig A. Lewis, Hogan Lovells US LLP of Washington, DC, for plaintiff-intervenors Canadian Solar, Inc., Canadian Solar International Limited, Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., Canadian Solar (USA) Inc. and Shanghai BYD Co., Ltd.  Also on the briefs were Jonathan T. Stoel and Michael G. Jacobson.

Neil R. Ellis, Richard L.A. Weiner, Justin R. Becker, Rajib Pal, and Shawn M. Higgins, Sidley Austin, LLP, of Washington, DC, for plaintiff-intervenors Yingli Green Energy Holding Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd., Shenzhen Yingli New Energy Resources Co., Ltd., Yingli Green Energy International Trading Co., Ltd., and Yingli Energy (China) Co., Ltd.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for defendant.  Also on the brief was Ethan P. Davis, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel was Ayat Mujais, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, New York, for consolidated defendant-intervenors Chint Solar (Zhejiang) Co., Ltd., Chint Energy (Haining) Co., Ltd., Chint Solar (Jiuquan) Co., Ltd., Chint Solar (Hong Kong) Company Limited.  Also on the brief was Dharmendra N. Choudhary and Jordan C. Kahn.

Kelly, Judge:  This consolidated action is before the court on motions for

judgment on the agency record.  See Pl. [Risen Energy Co., Ltd.]'s Mot. J. Agency R.,

**PUBLIC VERSION**

Mar. 26, 2020, ECF No. 40; [Pl.-Intervenors Canadian Solar, Inc. et al. & Shanghai

BYD Co., Ltd.'s] Mot. J. Agency R., Mar. 26, 2020, ECF No. 42; Pl.-Intervenors Yingli

Green Energy Holding Co., Ltd. et al.'s Mot. J. Agency R., Mar. 26, 2020, ECF No. 41

("Yingli's Mot."); SunPower Manufacturing Oregon LLC's Mot. J. Agency R., Mar. 26,

2020, ECF No. 43.  Plaintiff Risen Energy Co., Ltd. ("Risen"), Plaintiff-Intervenors

Canadian Solar, Inc. et al.[1] ("Canadian Solar") and Shanghai BYD Co., Ltd.

("Shanghai"),  and Yingli Green Energy Holding Co., Ltd. et al.[2] ("Yingli"), as well as

Consolidated   Plaintiff   SunPower   Manufacturing   Oregon,   LLC   ("SunPower")

challenge various aspects of the U.S. Department of Commerce's ("Commerce") fifth

administrative review of the antidumping duty ("ADD") order on crystalline silicon

---

[1] Plaintiff-Intervenors Canadian Solar, Inc., Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., CSI Cells Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., Canadian Solar (USA) Inc. are referred to, collectively, as "Canadian Solar." Canadian Solar and Shanghai request the court remand this case to Commerce with instructions to recalculate its dumping margin to reflect any changes made to Risen's dumping margin.

[2] Plaintiff-Intervenors Yingli Green Energy Holding Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd., Shenzhen Yingli New Energy Resources Co., Ltd., Yingli Green Energy International Trading Co., Ltd., and Yingli Energy (China) Co., Ltd. are referred to, collectively, as "Yingli".   Yingli expresses support for arguments raised in Risen's brief, and requests that the court remand this proceeding to Commerce "with instructions to revise its final results and recalculate the dumping margin applicable to Risen, and also recalculate the weighted average separate rate applicable to Yingli." See Yingli's Mot. at 1–2.

photovoltaic cells, whether or not assembled into modules ("solar cells"), from the

People's Republic of China ("PRC" or "China").[3] See [Pl. Risen's] Memo. Supp. Mot.

J. Agency R. at 1–2, 14–34, Mar. 26, 2020, ECF No. 40-2 ("Risen's Br."); [Pl.-

Intervenors Canadian Solar's & Shanghai's] Memo. Supp. Mot. J. Agency R. at 1, 9–

18, Mar. 26, 2020, ECF No. 42-1 ("Pl.-Intervenors' Br."); [SunPower's] Memo. Supp.

56.2 Mot. J. Agency R. Confidential Version at 1–3, 10–32, Mar. 26, 2020, ECF No.

44 ("SunPower's Br."); see also Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, From the [PRC], 84 Fed. Reg. 36,886 (Dep't Commerce July

30, 2019) (final results of [ADD] admin. review and final determination of no

shipments; 2016–2017) ("Final Results") and accompanying Issues and Decisions

Memo. for the [Final Results], A-570-979, (July 24, 2019), ECF No. 33-2 ("Final

Decision Memo"); Initiation of [ADD] & Countervailing Duty Admin. Reviews, 83 Fed.

Reg. 8,058 (Dep't Commerce Feb. 23, 2018) ("Initiation of Reviews");   Crystalline

Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC],

77 Fed. Reg. 73,018 (Dep't of Commerce Dec. 7, 2012) (amended final determination

of sales at less than fair value, and [ADD] order) ("ADD Order").

---

[3] Risen and SunPower also appear as Defendant-Intervenors in this consolidated action. See Order, Oct. 30, 2019, ECF No. 25 (granting SunPower's consent motion to intervene as defendant-intervenor); Order, Oct. 21, 2019, ECF No. 11 (Member Docket No. 19-155) (granting Risen's consent motion to intervene as defendant-intervenor).

Namely, Plaintiff Risen and Plaintiff-Intervenors challenge Commerce's decision to apply partial facts available with an adverse inference ("adverse facts available" or "AFA")[4] when calculating the normal value of Risen's entries of subject merchandise to fill gaps in the record caused by the refusal of certain unaffiliated suppliers to cooperate with Commerce's investigation. See Risen's Br. at 14–34; Pl.-Intervenors' Br. at 9–18. Consolidated Plaintiff SunPower challenges Commerce's refusal to apply partial AFA to Risen's cooperative unaffiliated suppliers. See SunPower's Br. at 14–20. Moreover, SunPower challenges Commerce's valuation of the nitrogen input, see id. at 20–28, Commerce's selection of Descartes freight rates to value ocean freight expenses, see id. at 29–32, and Commerce's decision to adjust the export price (or constructed export price) ("U.S. Price") by the amount of the countervailing duty ("CVD") imposed to offset the benefit conferred to manufacturers and producers by the Export Import Bank of China's ("Ex-Im Bank") Export Buyer's Credit Program ("Credit Program") in the concurrent administrative review of the companion CVD order ("companion CVD review"). See id. at 10–14.

---

[4] Parties and Commerce sometimes use the shorthand "AFA" or "adverse facts available" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. AFA, however, encompasses a two-part inquiry established by statute. See 19 U.S.C. § 1677e(a)–(b). It first requires Commerce to identify information missing from the record, and second, to explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available." Id.

For the following reasons, the court sustains Commerce's refusal to apply partial AFA to Risen's cooperative unaffiliated suppliers; Commerce's decision to value Risen's nitrogen FOP using Bulgarian import data; Commerce's decision to use Descartes data to value ocean freight expenses; and Commerce's decision to adjust the U.S. Price by the amount of the CVD imposed to offset the benefit conferred to manufacturers and producers by the Credit Program in the companion CVD review. However, the court remands, for further explanation or reconsideration, Commerce's application of partial AFA to Risen's uncooperative unaffiliated suppliers.

## BACKGROUND

In 2012, Commerce published the ADD order covering solar cells from China. See generally ADD Order. On February 23, 2018, in response to timely requests, Commerce initiated its fifth administrative review of the ADD Order. See generally Initiation of Reviews. Commerce chose Risen and Chint Solar Zhejiang Co., Ltd. ("Chint")[5] as mandatory respondents.[6] See Second Resp't Selection Memo. [for 2016-

---

[5] For purposes of this review, Commerce treated Chint Solar, Chint Energy (Haining) Co., Ltd., Chint Solar (Jiuquan) Co., Ltd., and Chint Solar (Hong Kong) Company Limited as a single "collapsed" entity. See Prelim. Decision Memo at 7–8; Final Decision Memo at 1 n.2. If affiliated producers and exporters are collapsed, those companies may be considered a single entity. Collapsing entities allows sales of one collapsed entity to be considered sales of the other for purposes of Commerce's dumping margin calculation. See 19 C.F.R. § 351.401(f)(1) (2018); 19 U.S.C. §§ 1675(a)(2)(A)(ii), 1677b(a).

[6] Commerce initially selected Risen and the collapsed entity Changzhou Trina Solar

(footnote continued)

**PUBLIC VERSION**

2017 Admin. Review], PD 147, bar code 3696673-01 (Apr. 19, 2018) ("Second Resp't

Selection Memo");[7] Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled

Into Modules, From the [PRC], 83 Fed. Reg. 67,222 (Dep't Commerce Dec. 28, 2018)

(prelim. results of [ADD] admin. review and prelim. determination of no shipments;

2016–2017 ) ("Prelim. Results") and accompanying Issues and Decisions Memo. for

the [Prelim. Results] at 2–3, 7–8, A-570-979, PD 497, bar code 3785207-01 (Dec. 20,

2018) ("Prelim. Decision Memo").

On December 28, 2018, Commerce published its preliminary determination.

See generally Prelim. Results; Prelim. Decision Memo.   Given that Commerce

considers the PRC to be a nonmarket economy ("NME"), when calculating Risen's and

Chint's dumping margin,[8] Commerce determined the normal value of Risen's and

---

Energy Co., Ltd. ("Trina") as mandatory respondents.  See Resp't Selection Memo.
[for 2016-2017 Administrative Review] at 5–7, PD 79, bar code 3682915-01 (Mar. 15,
2018).  Upon requests from both Trina and petitioners, Commerce rescinded its
review of Trina and instead selected Chint as a mandatory respondent.  See Prelim.
Decision Memo at 3; Second Resp't Selection Memo at 2–3.

[7] On August 31, 2020, Defendant submitted indices to the public and confidential
administrative records underlying Commerce's final determination. These indices are
located on the docket at ECF Nos. 68 and 67, respectively. All further references in
this opinion to administrative record documents are identified by the numbers
assigned by Commerce in those indices and preceded by "PD" and "CD" to denote
public or confidential documents.

[8] The term "nonmarket economy country" denotes any foreign country that Commerce
determines "does not operate on market principles of cost or pricing structures, so
that sales of merchandise in such country do not reflect the fair value of the
merchandise."  Section 771(18)(A) of the Tariff Act of 1930, as amended, 19 U.S.C.

(footnote continued)

**PUBLIC VERSION**

Chint's entries of subject merchandise by using data from a surrogate market economy country ("surrogate country") to value the factors utilized to produce the subject merchandise ("factors of production" or "FOPs"). See Section 773(c)(4) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(c)(4) (2018).[9]  Commerce chose Thailand as the primary surrogate country for purposes of valuing all FOPs. See Prelim. Decision Memo at 16–19. Commerce resorted to partial AFA to calculate the value of certain FOPs because several of Risen's unaffiliated solar cell and module suppliers refused to cooperate with Commerce's requests for information. See Prelim. Decision Memo at 15–16. Namely, Commerce applied the highest reported consumption rates in place of missing consumption figures for certain inputs used by Risen to produce subject merchandise sold in the U.S. during the period of review ("POR"), but only to the extent that the information on those inputs was missing due to the refusal of Risen's unaffiliated suppliers to cooperate. See Risen Unreported FOPs Memo. at 9–10, PD 508, CD 898, bar codes 3785421-01, 3785419-01 (Dec. 20, 2018) ("Unreported FOPs Memo"). Finally, Commerce used data on ocean freight rates from the Maersk Line and Descartes websites ("Maersk data" and "Descartes

§ 1677(18)(A) (2018). In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses]." Id. § 1677b(c)(1).

[9] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

data") to value ocean freight expenses.  Prelim. Decision Memo at 28.  With respect to its calculation of U.S. Price, Commerce declined to increase the U.S. Price by the amount of any CVD imposed to offset the Ex-Im Bank's Credit Program in the companion CVD review.  See Prelim. Decision Memo at 32–33; see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 83 Fed. Reg. 34,828 (Dep't Commerce July 23, 2018) (final results of CVD admin. review; 2015) ("CVD AR") and accompanying Issues and Decisions Memo. for [CVD AR] Cmts. at 1–2, C-570-980, (July 12, 2018), available at https://enforcement.trade.gov/frn/summary/prc/2018-15692-1.pdf (last visited Oct. 26, 2020) ("CVD AR IDM").  Commerce calculated preliminary weighted-average dumping margins of 15.74 and 98.41 percent for Risen and Chint, respectively. Prelim. Results, 83 Fed. Reg. at 67,224.

For the Final Results, although continuing to rely on Thailand as the primary surrogate country, Commerce decided that Thai data on nitrogen prices were unreliable and determined instead to use Bulgaria's Global Trade Atlas ("GTA") import data ("Bulgarian import data") to derive a surrogate value for the nitrogen input.  See Final Decision Memo at 37–43.  Moreover, instead of using both Maersk and Descartes data to calculate ocean freight rates, Commerce relied solely on Descartes data because its freight rates "are contemporaneous with the POR, for a container size used by the respondents, and, where possible, product specific[.]"  Final Decision Memo at 59.  Finally, upon reconsideration of its initial position, Commerce

determined that it was necessary to increase the U.S. Price to account for countervailing duties it imposed to offset the Ex-Im Bank's Credit Program in the companion CVD review.  <u>See</u> Final Decision Memo at 15–17.  Commerce calculated final dumping margins of 4.79 and 2.67 percent for Risen and Chint, respectively.  <u>Final Results</u>, 84 Fed. Reg. at 36,888.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final determination in an administrative review of an ADD order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.   Use of Bulgarian Import Data

SunPower argues that Commerce's determination that the Thai data was unreliable is not supported by substantial evidence because Commerce failed to point to evidence that the data was aberrant.  <u>See</u> SunPower's Br. at 20–28.  Defendant, Chint and Risen counter that Commerce reasonably determined that the Thai data was unreliable due to inconsistencies in the reported value of the nitrogen input between sources of Thai pricing data on the record.  <u>See</u> Def.'s Resp. to Pls.' Mots. J. Agency R. at 30–34, July 10, 2020, ECF No. 52 ("Def.'s Br."); Consol. Def.-Intervenor [Chint's] Resp. to [SunPower's] 56.2 Mot. J. Agency R. at 18–32, July 10, 2020, ECF

No. 51 ("Chint's Resp. Br."); Def.-Intervenor [Risen's] Resp. Opp'n Consol. Pl.'s Mot.

J. Agency R. at 14–18, July 10, ECF No. 49 ("Risen's Resp. Br.").  For the following

reasons, Commerce's decision to rely on Bulgarian import data is sustained.

When conducting an administrative review of an ADD order, Commerce

determines whether the subject merchandise is sold into the U.S. at less than fair

value by comparing the normal value of the merchandise with its U.S. Price during

the POR.  19 U.S.C. §§ 1673d,[10] 1677(35)(A).  Commerce calculates antidumping

duties owed on entries of merchandise to reflect the amount by which the normal

value exceeds the U.S. Price (i.e., the dumping margin).  See id; see also 19 U.S.C.

§§ 1677b, 1677a.

Commerce usually determines normal value based on sales of the subject

merchandise in the foreign market or in a third country comparator market.  See 19

U.S.C. § 1677b(a)(1)(A)–(C).  However, when conducting an administrative review of

an ADD order covering merchandise from a country that Commerce has designated

a non-market economy ("NME"), "sales of merchandise in [that NME] country do not

reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).  As such, in NME

proceedings, Commerce calculates normal value based on the FOPs for the subject

merchandise, with an added amount for general expenses and profits plus the cost of

---

[10] The U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") has clarified
that the methods under 19 U.S.C. § 1673d apply to administrative reviews as well as
investigations. See Albemarle Corp. v. United States, 821 F.3d 1345, 1352–53 (Fed.
Cir. 2016).

containers, coverings, and other expenses.  <u>See</u> 19 U.S.C. § 1677b(c); <u>see also</u> 19

C.F.R. § 351.408 (2018).[11]   In so doing, Commerce relies on "best available

information" about the value of the FOPs used to produce the merchandise derived

from one or more surrogate market economy countries ("surrogate values") that are

at a comparable level of economic development to the NME country and where there

are significant producers of the subject merchandise. 19 U.S.C.

§ 1677b(c)(4).  To the extent possible, Commerce's regulatory preference is to "value

all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).

Commerce has broad discretion to decide what constitutes "the best available

information," as the phrase is not statutorily defined.  <u>See</u> <u>QVD Food Co. v. United

States</u>, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  However, the agency must ground its

selection in the overall purpose of the statute, which is to calculate accurate dumping

margins.  <u>See</u> <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed. Cir.

1990); <u>see also</u> <u>Parkdale Int'l. v. United States</u>, 475 F.3d 1375, 1380 (Fed. Cir. 2007).

Commerce normally selects the best available information by evaluating data

sources based on their: (1) specificity to the input; (2) tax and import duty exclusivity;

(3) contemporaneity with the POR; (4) representativeness of a broad market average;

and (5) public availability.  <u>See</u> Import Admin., U.S. Dep't Commerce, <u>Non-Market

Economy Surrogate Country Selection Process</u>, Policy Bulletin 04.1 (2004), <u>available</u>

---

[11] Further citations to Title 19 of the Code of Federal Regulations are to the 2018
edition.

at https://enforcement.trade.gov/policy/bull04-1.html (last visited Oct. 26, 2020)
("Policy Bulletin 04.1").

Although it prefers to value all FOPs using data from a single surrogate
country, Commerce decides not to use data from Thailand and uses Bulgarian import
data to value nitrogen.  See Final Decision Memo at 40–43.  Commerce observes that
the AUV of imports of nitrogen into Thailand derived from the GTA data ("Thai
import data") is $10.05 per kilogram, while GasWorld data on domestic prices for
nitrogen in Thailand provide values of $0.13 per kilogram for liquid nitrogen and
$0.05 per kilogram for nitrogen gas.  See id. at 40–41.  Noting similar disparities
between prices for nitrogen imports and domestic prices for nitrogen in Mexico and
South Africa, and citing "concerns regarding the actual broad market price of nitrogen
in those countries[,]" Commerce considers several alternative surrogate countries.
See id. at 41–43.  Commerce selects import data from Bulgaria because, among the
sources that satisfy its selection criteria, Bulgaria has the highest volume of imports
of nitrogen.  See Final Decision Memo at 41–42.

Commerce's decision to rely on the Bulgarian import data is supported by
substantial evidence.  According to Commerce, not only does the Bulgarian import
data satisfy its selection criteria, Bulgaria is also the surrogate country with the
largest volume of nitrogen imports amongst the alternative sources on the record.
See Final Decision Memo at 41–42.  It is reasonable for Commerce to infer that using
a larger sample size would result in a more representative and less distortive

surrogate value.  See id.  Contrary to SunPower's argument, it is also reasonable for

Commerce to infer—from significant disparities between the nitrogen GTA import

data and GasWorld domestic pricing data for Thailand, Mexico, and South Africa—

that one, or both, are unreliable sources of nitrogen AUV data.  See id. at 43.  A wide

divergence in the reported value of nitrogen between the sources suggests that either

the import prices or the domestic prices, or both, are inaccurate and untrustworthy

for purposes of valuing the nitrogen input.  Without record evidence as to which

source is the reliable one, it stands to reason that Commerce would depart from its

practice of valuing all FOPs based on a single surrogate country, and instead rely on

Bulgarian import data in order to avoid using distorted data.

Moreover, SunPower's argument that Commerce fails to demonstrate that the

GasWorld data on domestic prices is an appropriate benchmark against which to

determine whether the GTA import data is aberrant misses the point.  As it explains,

Commerce finds the Thai import data to be unreliable, not aberrant.  See Final

Decision Memo at 42–43.  SunPower might prefer that Commerce ignore the

GasWorld data when determining whether the GTA  data is reliable, but the court

cannot say that it is unreasonable for Commerce to consider the disparities between

the two datasets.  As such, Commerce's determination is sustained.

## II.  Commerce's Application of Partial AFA

Risen and Plaintiff-Intervenor's submit that Commerce's decision to apply

partial AFA against Risen's suppliers to fill the gaps in record evidence caused by its

Consol. Court No. 19-00153                                                      Page 15
**PUBLIC VERSION**

uncooperative unaffiliated suppliers is an impermissible application of 19 U.S.C.

§ 1677e in this instance.   <u>See</u> Risen's Br. at 14–33; Pl.-Intervenors' Br. at 9–18.

Defendant counters that Commerce's decision to apply partial AFA with respect to

those unaffiliated suppliers who refused to cooperate with Commerce's inquiry

reasonably balances its statutory obligation to calculate accurate margins with its

policy of using adverse inferences to induce cooperation. <u>See</u> Def.'s Br. at 11–25. For

the following reasons, Commerce's decision to apply partial AFA against Risen's

suppliers is remanded for further explanation or reconsideration.

     To determine the normal value of the subject merchandise in NME countries

Commerce solicits input data and surrogate values for those inputs from the parties.

<u>See e.g.</u>, <u>Globe Metallurgical, Inc. v. United States</u>, 32 CIT 1070, 1075 (2008). Where,

despite its solicitations, information necessary to calculate normal value is not

available on the record, Commerce uses "facts otherwise available" in place of the

missing information.  <u>See</u> 19 U.S.C. § 1677e(a)(1).[12]  If Commerce further "finds that

---

[12] 19 U.S.C. § 1677e(a) also applies where an interested party or any other person—

> (A) withholds information that has been requested by the administering authority or the Commission under this title,

> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 [19 USCS § 1677m(c)(1) and (e)],

> (C) significantly impedes a proceeding under this title, or

(footnote continued)

an interested party has failed to cooperate by not acting to the best of its ability to

comply with a request for information," Commerce may apply "an inference that is

adverse to the interests of that party in selecting among the facts otherwise

available[.]"  Id. § 1677e(b)(1).  However, under certain circumstances, Commerce

may incorporate an adverse inference under § 1677e(a) in calculating a cooperative

respondent's margin, if doing so will yield an accurate rate, promote cooperation, and

thwart duty evasion.  See Mueller Comercial de Mexico S. De R.L. de C.V. v. United

States, 753 F.3d 1227, 1232–36 (Fed. Cir. 2014) ("Mueller").  When analyzing the use

of an adverse inference as a part of a § 1677e(a) analysis, the predominant concern

must be accuracy.  See id. at 1233.

Stating that it is operating "primarily under" 19 U.S.C. § 1677e(a), Commerce

explains that, in furtherance of the policy objectives of promoting cooperation and

thwarting duty evasion as cited in Mueller, it selects the highest FOP consumption

rates reported by Risen and Chint to fill the gap in the record caused by Risen's and

Chint's unaffiliated suppliers failure to comply with its request for information.  See

Final Decision Memo at 9–14; see also Mueller, 753 F.3d at 1232–36.  Commerce

explains that using the highest FOP consumption rates as plugs for missing cost data

---

(D) provides such information but the information cannot be verified as
provided in section 782(i) [19 USCS § 1677m(i)], the administering authority
and the Commission shall, subject to section 782(d) [19 USCS § 1677m(d)], use
the facts otherwise available in reaching the applicable determination under
this title.

19 U.S.C. § 1677e(a)(2).

caused by Risen's and Chint's uncooperative unaffiliated suppliers prevents the "real possibility" that suppliers will avoid duties by exporting through the mandatory respondents, and that doing so also deters non-cooperation.  Final Decision Memo at 12.  Although Risen and Chint each cooperated with its investigation, Commerce observes that incorporating adverse inferences furthers its policy objectives because Risen and Chint are "significant producers in the solar market" and "could potentially induce the cooperation of the [non-cooperative] suppliers."  Id.  Commerce then concludes that its application of the highest FOP consumption rates solely where FOP information is missing due to the refusal of Risen's and Chint's suppliers to cooperate promotes accuracy by ensuring that any increase to the dumping margin is commensurate with the amount of non-cooperation by the suppliers.  See id. at 13.

Commerce's determination is unsupported by substantial evidence.  The evidence that Commerce cites does not support its claim that using partial AFA furthers its policy objectives.  Regarding the threat of duty evasion, unlike the supplier at issue in Mueller, the unaffiliated suppliers in this case are not mandatory respondents refusing to participate in the review, see Mueller, 753 F.3d at 1229–30, 1235, and Commerce does not point to substantial evidence to otherwise support its concern that the unaffiliated suppliers intend to evade their own potential duties by exporting subject merchandise into the U.S. through Risen.[13]  See id.  Moreover,

---

[13] The court discusses Commerce's determination with respect to Risen since Chint does not challenge Commerce's application of partial AFA.

regarding Commerce's aim of deterring non-cooperation, Commerce cites no evidence

of a mechanism or relationship that Risen could use to induce the cooperation of their

unaffiliated suppliers.    Compare id., 753 F.3d at 1234–35 (explaining how

Commerce's policy objective of inducing cooperation may be advanced where there is

an existing relationship between the mandatory respondent and uncooperative

supplier) with Final Decision Memo at 13 (determining that a plausible threat that

the mandatory respondent may refuse to purchase subject merchandise from the

suppliers is sufficient to induce cooperation).[14]   Commerce observes that Risen is a

large producer that may refuse to purchase subject merchandise from the non-

cooperating, unaffiliated suppliers, see id. at 12, but such observations do not

---

[14] Defendant claims that "Commerce went beyond highlighting Risen's size and market presence by also considering the nature of Risen's supplier partnership" to determine that Risen had sufficient leverage over its unaffiliated suppliers, Def.'s Br. at 22 (quoting Unreported FOPs Memo at 7–8), but any consideration of Risen's supplier partnerships appears cursory.  As support for its claim that Commerce considered the existence of "'back-to-back' agreements and existing relationships", Defendant quotes Commerce's conclusion in the Unreported FOPs Memo that "Risen is an important customer to its Chinese solar cell suppliers." Id.  Neither Defendant nor Commerce explain how the importance of Risen's relationship to its customers is such that Risen "is in a position to induce cooperation from those suppliers." Unreported FOPs Memo at 8.  On the other hand, Risen submits that it has no control over the business and production records of its unaffiliated suppliers. Pl. [Risen's] Reply Br. at 12, Aug. 17, 2020, ECF No. 64 ("Risen's Reply Br.").  Risen explains that it purchases inputs from a large number of unaffiliated suppliers at relatively small quantities, and that no supplier was exclusively dependent on Risen as a purchaser. See id. at 11–12 (citations omitted).  On remand, should Commerce continue to apply partial AFA, it should explain why its determination is reasonable in light of any detracting record evidence raised with respect to this issue.

demonstrate that Risen had leverage over its unaffiliated suppliers under a more searching § 1677e(a) analysis.[15]

Commerce also fails to adhere to <u>Mueller</u>'s emphasis on accuracy above all else. See <u>Mueller</u>, 753 F.3d at 1233.  Commerce states that it properly takes into account the predominant interest in calculating accurate dumping margins  by only applying adverse inferences "precisely to and commensurate with the amount of uncooperation by the suppliers[.]"  Final Decision Memo at 13.  Yet, Commerce does not cite record evidence that using the highest FOP consumption rates on the record result in accurate dumping margins for Risen.  See <u>Mueller</u>, 753 F.3d at 1232–33.[16]  As such,

---

[15] Commerce and Defendant cite dicta from <u>KYD, Inc. v. United States</u> as support for Commerce's reasoning that Risen's exposure to enhanced ADD duties could potentially induce the cooperation of its unaffiliated suppliers.  <u>See e.g.</u>, Final Decision Memo at 12 (citing 607 F.3d 760, 768 (Fed. Cir. 2010) ("<u>KYD</u>")); Def.'s Br. at 16–17.  Irrespective of the applicability of <u>KYD</u>'s dicta, the Court of Appeals in <u>Mueller</u> stressed the importance of there being an existing relationship between the cooperating and the non-cooperating suppliers where Commerce seeks to use partial AFA to induce cooperation.  <u>See Mueller</u>, 753 F.3d at 1234–35 (citing, inter alia, <u>KYD</u>, 607 F.3d at 768).  Here, as explained above, Commerce cites no evidence of such a relationship between Risen and its unaffiliated suppliers.

[16] Defendant invokes <u>Nan Ya</u> to argue that Commerce need only demonstrate that the partial AFA rate is a reasonably accurate estimate of the respondent's actual rate. <u>See</u> Def.'s Br. at 21–22 (citing <u>Nan Ya Plastics Corp. v. United States</u>, 810 F.3d 1333, 1344 (Fed. Cir. 2016); <u>F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027 (Fed. Cir. 2000); <u>Papierfabrik Aug. Koehler SE v. United States</u>, 843 F.3d 1373 (Fed. Cir. 2016)).  <u>Nan Ya</u>, however, involved adverse inferences against uncooperative respondents under 19 U.S.C. § 1677e(b), while here, Commerce states that it is operating "primarily under" § 1677e(a) to apply partial AFA against cooperative respondents.  Moreover, Commerce cites no evidence that using the highest consumption rates results in a "reasonably accurate estimate of [Risen's] actual rate[.]"  Def.'s Br. at 22.

the court must remand to Commerce for further explanation or reconsideration.[17]  On

remand, should Commerce continue to rely on partial AFA on the basis of the same

policy objectives, it should point to evidence of an existing relationship or mechanism

that Risen could have used to induce the cooperation of its unaffiliated suppliers, and

should furthermore explain why the highest FOP consumption rates on the record

further the predominant interest in calculating accurate dumping margins.

---

[17] Risen and Plaintiff-Intervenors also argue that Commerce's determination that
FOP information missing from the record was significant is arbitrary and capricious.
See Risen's Br. at 26–33; Pl.-Intervenors' Br. at 17 (expressing support for Risen's
argument).  Commerce, however, explains that [[    ]] percent and [[    ]] percent
of solar cells and solar modules, respectively, came from uncooperative unaffiliated
suppliers, and that these amounts constitute a material quantity that distinguishes
its decision from other situations where Commerce has excused respondents from
reporting FOPs.   Unreported FOPs Memo at 10.   Thus, contrary to Risen's
submission, see Risen's Br. at 31, Commerce does provide a reasoned explanation for
its determination.   Risen does not explain how Commerce's decision is arbitrary
capricious, but rather, takes issue with how Commerce weighed the evidence, and
argues that Commerce should have found the FOP information on the record was a
reasonable and representative sample of Risen's costs.   See id. at 31 (arguing that
Commerce did not consider the quantity of unaffiliated suppliers, the average amount
of FOP data from each uncooperative supplier, Risen's business model, and the solar
panel industry in China).  Regardless of whether the remaining FOP information on
the record was sufficient to constitute a reasonable and representative sample of
Risen's costs based on its preferred considerations, Risen points to no authority
limiting Commerce's discretion to request FOP information from all of Risen's
suppliers and fails to persuade that Commerce's decision to do so is arbitrary and
capricious in light of its evidence-based determination and reasoned explanation.  See
Final Decision Memo at 24.

**PUBLIC VERSION**

### III.   Commerce's Refusal to Apply Facts Available to Risen's Cooperative Unaffiliated Suppliers

SunPower challenges Commerce's refusal to apply partial AFA to Risen's cooperative unaffiliated suppliers. <u>See</u> SunPower's Br. at 14–20. Namely, SunPower argues that Commerce's determination that the suppliers Commerce deemed cooperative acted to the best of their ability is unreasonable due to "glaring" deficiencies in their responses to Commerce's inquiry.[18] <u>See</u> <u>id.</u> Defendant counters that Commerce's determination is reasonable because the cooperative suppliers explained the deficiencies in their submissions, and their responses were sufficient to enable Commerce to calculate a dumping margin. <u>See</u> Def.'s Br. at 25–30. For the following reasons, Commerce's refusal to apply partial AFA to Risen's cooperative suppliers are sustained.

As explained, where information necessary to calculate a respondent's dumping margin is not available on the record, or where information has been withheld, is untimely, cannot be verified, or a party impedes the proceeding, Commerce applies "facts otherwise available" in place of the missing information. <u>See</u> 19 U.S.C. § 1677e(a). If Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may apply "an inference that is adverse to the interests of

---

[18] SunPower thus challenges Commerce's determination that these suppliers are "cooperative." <u>See</u> SunPower's Br. at 14–20.

that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1).

A respondent cooperates to the "best of its ability" when it "has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Here, Commerce finds that the supplemental responses it received from the six cooperative unaffiliated suppliers adequately address the deficiencies that SunPower complains of, eliminating a need to employ facts available under 19 U.S.C. § 1677e(a). See Final Decision Memo at 23–24; see also SunPower's Br. at 16–17. Implicit in its conclusion that "the information provided by [the unaffiliated suppliers] is sufficient to calculate an accurate margin for Risen" is Commerce's finding that necessary information is not missing from the record pursuant to 19 U.S.C. § 1677e(a)(1). See Final Decision Memo at 23–24. Moreover, Commerce "do[es] not find that the suppliers withheld information that had been requested or significantly impeded the proceeding under [19 U.S.C. § 1677e(a)(2)(C)], because they responded to Commerce's requests for information by providing the requested information." Id. at 24. SunPower, pointing to various purported deficiencies in the suppliers' factual submissions, contests Commerce's determination that the suppliers provided sufficient information, and claims that the deficiencies themselves demonstrate that

the suppliers failed to act to the best of their ability.[19]  Commerce addresses the

discrepancies identified by SunPower,[20] and concludes that the information provided

---

[19] Commerce, Defendant, and SunPower occasionally conflate the two distinct analytical steps of 19 U.S.C. § 1677e(a) and (b).  Commerce concludes that the suppliers provided sufficient information to calculate accurate rates.  See Final Decision Memo at 22–24.  Its conclusions with respect to whether necessary information was missing from the record and whether the suppliers had sufficiently responded to Commerce's inquiries would seem to obviate the need for an analysis of whether those suppliers had acted to the best of their ability.  Yet, in the Final Decision Memo, Commerce continues to analyze whether the suppliers acted to the best of their ability.  See id. at 24.   However, as stated above, AFA is a short-hand term employed by many parties before Commerce and before this Court that actually refers to two distinct statutory provisions.  Using the shorthand masks the statutory basis upon which Commerce relies, specifically § 1677e(a).

[20] First, with respect to SunPower's contention that certain suppliers failed to support or reconcile their reported labor, electricity, and water consumption amounts, see SunPower's Br. at 15–18, Commerce preliminarily notes that it did not ask for supporting documentation and that it is not required to request such documentation, since Commerce usually reviews such documents at verification.  See Final Decision Memo at 23.   Moreover, Commerce explains that the cooperating companies "described the steps used in their cost reconciliations in their Section D responses[,]" "performed the basic steps of reconciling profit and loss statements to cost of goods sold, cost of production, and POR raw material consumption" and, where certain suppliers were asked, they complied with Commerce's request to "reconcile [their] audited financial statements to their cost reconciliations[.]"  As such, Commerce did not find it necessary to issue additional questions regarding these reconciliations.  See id. at 23. Second, in response to SunPower's concerns about missing audited financial statements, see SunPower's Br. at 15, Commerce explains that, where a supplier maintained audited financial statements, the supplier submitted such statements to Commerce.  See id. at 23. Third, with respect to SunPower's concerns about   reconciliations   with   [[
            ]]   Commerce notes that all but one supplier explained that these negative quantities relate to "returns into inventory of items that were not consumed in production[,]"   and   that   the   suppliers   submitted   credit   notes   and   return-slips

(footnote continued)

**PUBLIC VERSION**

by the six cooperative suppliers is sufficient to calculate an accurate dumping margin

for Risen.  <u>See</u> Final Decision Memo at 23–24.  SunPower does not explain why

Commerce's determination was unreasonable, but rather, requests the court reweigh

the evidence, which the court will not do.  <u>See</u> SunPower's Br. at 18–20; <u>but see</u>

<u>Downhole Pipe & Equipment, L.P. v. United States</u>, 776 F.3d 1369, 1376 (Fed. Cir.

2015).  As such, Commerce's determination is sustained.

## IV.    Reliance on Descartes Freight Rates to Value Ocean Freight

SunPower argues that Commerce contravenes agency practice by refusing to

use Maersk data on ocean freight rates, and further submits that Commerce's

reliance on Descartes data was unsupported by substantial evidence because

---

supporting their explanation.  <u>See</u> <u>id.</u> at 23; <u>see also</u> SunPower's Br. at 18.  The remaining company, Commerce explained, demonstrated "through tracing the steps in the cost reconciliation, that the negative withdrawals pertained to transferring expenses from production to research and development[,] but, nonetheless, the corresponding quantities were included in the reported POR consumption."  Final Decision Memo at 23.  Commerce found this explanation to be sufficient.  <u>See</u> <u>id.</u> Fourth, Commerce "sought clarification from three suppliers as to why certain materials identified in their inventory-out details, and submitted as part of their cost-reconciliations, were excluded from their reported consumption."  <u>Id.</u> at 24. Commerce found, that in some instances, the materials are the same inputs used by Risen and the supplier to produce the subject merchandise, and in others, that— although the materials had a different name—they appeared to be the same or similar to inputs used to produce the merchandise other consideration.  <u>See</u> <u>id.</u> at 24. Commerce found satisfactory the companies' responses that these materials were either not used to produce merchandise supplied to Risen, or that they were used for purposes other than production.  Commerce's response demonstrates that it has considered detracting evidence raised in SunPower's submissions and reasonably determines that the information provided by the cooperative suppliers was sufficient to calculate an accurate dumping margin.  <u>See</u> <u>id.</u>

Descartes data is specific to chemical products.  See SunPower's Br. at 29–32.
Defendant, Chint and Risen argue that Commerce reasonably chose Descartes data
because, in addition to being contemporaneous and representing a broad market
average, it is also publicly available unlike Maersk data.  See Def.'s Br. at 34–37;
Chint's Resp. Br. at 32–37; Risen's Resp. Br. at 18–23.  For the following reasons,
Commerce's decision to rely on Descartes data is sustained.

As explained, when determining the "best available information" on freight
rates to value ocean freight expenses, Commerce normally evaluates data sources
based on their: (1) specificity to the input; (2) tax and import duty exclusivity; (3)
contemporaneity with the POR; (4) representativeness of a broad market average;
and (5) public availability.  See Policy Bulletin 04.1.  Commerce's determination must
be supported by substantial evidence, meaning the evidence is sufficient such that a
reasonable mind might accept the evidence as adequate to support Commerce's
conclusion while considering contradictory evidence.  Consol. Edison Co. of New York
v. NLRB, 305 U.S. 197, 229 (1938).

Commerce's determination that Descartes data, without Maersk data
submitted by petitioners, better satisfies its selection criteria is supported by
substantial evidence.  See Final Decision Memo at 59–60.  In addition to being
contemporaneous with the POR and relating to the container size that respondents
use, Commerce observes that Descartes freight rates are product-specific to the

extent that they relate to shipments of solar panels and other solar products.[21]  <u>See</u>
<u>id.</u>

Moreover, Commerce explains that, unlike Maersk data rates submitted by the

petitioners, Descartes data freight rates are publicly available.  <u>See</u> Final Decision

Memo at 59–60.  It is thus reasonable for Commerce to disregard Maersk data and

rely exclusively on Descartes data to value ocean freight expenses.

SunPower maintains that Maersk data relating to electronics are more specific

than Descartes data.  <u>See</u> SunPower's Br. at 29–32.  However, it is reasonably

discernible from Commerce's reliance on Descartes freight rates for solar panels and

other solar products that it views those rates to be product-specific, and that it does

not consider Maersk data rates on electronics to be as specific to the subject

merchandise.  <u>See</u> Final Decision Memo at 59.   Further, it is undisputed that

SunPower submitted to Commerce business proprietary Maersk data.  <u>See</u> <u>id.</u> at 59–

60.[22]  It is reasonable for Commerce to conclude that publicly available data that is,

where possible, product-specific, better satisfies its selection criteria than business

---

[21] Although SunPower argues Descartes data "are specific to the shipment of chemical
products," Commerce explains that it only uses Descartes freight rates for shipments
of chemical products where rates for shipments of solar products to certain U.S.
regions are unavailable.  <u>See</u> SunPower's Br. at 31–32; <u>but see</u> Final Decision Memo
at 59.

[22] It is reasonably discernible from Commerce's statements regarding the treatment
of Maersk data in this review that it assesses public availability based on how the
information is submitted.   <u>See</u> <u>id.</u> at 59 ("We disregarded the petitioner's Maersk
rates, because they were treated as proprietary information on the record of this
review.").

proprietary data that is, as a whole, not as specific to the subject merchandise.  That SunPower comes to a different conclusion is, on its own, insufficient to invalidate Commerce's determination.  See Zhaoqing New Zhongya Aluminum Co., Ltd. v. United States, 36 CIT 1390, 1392, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951));[23] see also Final Decision Memo at 59–60.  As such, Commerce's decision to value ocean freight expenses using Descartes data is sustained.

## V.    Adjustment to the U.S. Price to Offset Export Buyer's Credit Program

SunPower argues that Commerce's decision to increase U.S. Price by the amount of the CVD imposed to offset China's Credit Program in the companion CVD review is unsupported by substantial evidence because Commerce made that determination based on AFA and thus made no finding that the Credit Program was export contingent.  See SunPower's Br. at 10–14.  Defendant, Chint and Risen counter that Commerce found the Credit Program to be export contingent, even if the

---

[23] That Commerce has previously used Maersk data to calculate ocean freight costs is immaterial.  SunPower calls Commerce's reliance on Maersk data a "longstanding practice", see SunPower's Br. at 30, but, in reality, the practice is relying on the methodology set out in the Policy Bulletin 04.1.  Within that framework, each case stands on its own record, so the fact that Commerce relied on a particular FOP source in one case does not bind it to rely on the same source in subsequent cases.

determination was based on AFA.  See Def.'s Br. at 7–11; Chint's Resp. Br. at 12–18;

Risen's Resp. Br. at 5–10.[24]  Commerce's determination is sustained.

When calculating the dumping margin, Commerce is statutorily required to

increase the U.S. Price by the amount of any CVD imposed on the subject

merchandise to offset an export subsidy.  19 U.S.C. § 1677a(c)(1)(C).  Here, Commerce

increases the U.S. Price by the amount of the CVD imposed in the companion CVD

review to offset the Credit Program because it finds that the Credit Program was

determined to be an export subsidy.  See Final Decision Memo at 16–17.  Specifically,

Commerce points to its determination, in the preliminary results of the companion

CVD review, that the benefit conferred by the Credit Program "is tied to export

performance[.]"  See Final Decision Memo at 17 (citations omitted).   Although, for

the final results of the companion CVD review, Commerce resorted to AFA to

countervail the Credit Program, see CVD AR IDM at Cmt. 2,  Commerce observes

"there is no indication . . . that [it] changed its finding that the program is tied to

export performance."  Final Decision Memo at 17.

The U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") decision

in Changzhou affirms Commerce's position and precludes SunPower's submission

---

[24] On September 9, 2020, Risen filed with the court a Notice of Supplemental
Authority, apprising the court of the Court of Appeals' decision in Changzhou Trina
Solar Energy Co. v. United States, Appeals No. 20-1004 (Fed. Cir. Sept. 3, 2020), and
noting the direct relevance of the decision to SunPower's challenge.  See Notice of
Supplemental Authority at 1–2, Sept. 9, 2020, ECF No. 69.

with respect to this issue. <u>See</u> SunPower's Br. at 10–14;  [SunPower's] Reply Br. at

4–5 & n.1, Aug. 17, 2020, ECF No. 66 ("SunPower's Reply Br.");  <u>but see</u> <u>Changzhou</u>

<u>Trina Solar Energy Co. v. United States</u>, Appeals No. 20-1004 at 16–20 (Fed. Cir.

Sept. 3, 2020) ("<u>Changzhou</u>"). As explained by the Court of Appeals in <u>Changzhou</u>,

that Commerce uses AFA to reach a decision to countervail a program "does not

obviate Commerce's obligation to make the 'applicable determination'" and to support

its determination with substantial evidence.  <u>Changzhou</u>, Appeals No. 20-1004 at 16–

17 (citations omitted); <u>see also</u> 19 U.S.C. §§ 1677e(a), 1671, 1677(5), (5A),

1516a(b)(1)(B)(i).   Based on the available descriptions of the program in the

companion review, it is reasonable for Commerce to conclude in this proceeding that

the Credit Program was determined to be specific based on export contingency.

Under <u>Changzhou</u>, SunPower's argument that Commerce's reliance on AFA means

that it "did not determine the [Credit Program] was export contingent" fails.

SunPower's Br. at 11; <u>but see</u> <u>Changzhou</u>, Appeals No. 20-1004 at 16–17.[25]  As such,

Commerce's determination is sustained.

---

[25] SunPower also argues that Commerce's decision to offset respondents' cash deposit
in this proceeding negates the adverse effect of its application of AFA in the
companion CVD review.  <u>See</u> SunPower's Br. at 12–14.  Risen notes, however, that
Commerce did not offset its cash deposit rate.  Risen's Resp. Br. at 9.  As SunPower
later acknowledges,  <u>see</u> SunPower's Reply Br. at 4 n. 1, irrespective of whether
Commerce did offset respondents' cash deposit rate, the Court of Appeals' holding in
<u>Jinko Solar Co. v. United States</u>, precludes this argument. <u>See</u> 961 F.3d 1177, 1181–
84 (Fed. Cir. 2020).

**CONCLUSION**

For foregoing reasons, it is

**ORDERED** that Commerce's refusal to apply partial AFA to Risen's cooperative unaffiliated suppliers is sustained; and it is further

**ORDERED** that Commerce's decision to value Risen's nitrogen input using Bulgarian import data is sustained; and it is further

**ORDERED** that Commerce's decision to use Descartes data to value ocean freight expenses is sustained; and it is further

**ORDERED** that Commerce's decision to adjust U.S. Price by the amount of the CVD imposed to offset the benefit conferred to manufacturers and producers by the Credit Program in the companion CVD review is sustained; and it is further

**ORDERED** that Commerce's application of partial AFA to Risen is remanded for further explanation or reconsideration; and it is further

**ORDERED** that Commerce shall incorporate, to the extent required by law, any adjustments to Risen's dumping margin resulting from the remand redetermination into its calculation of the separate rate or separate rates applicable to individual respondents; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

Consol. Court No. 19-00153                                                                Page 31
**PUBLIC VERSION**

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.

 /s/ Claire R. Kelly  
Claire R. Kelly, Judge

Dated:          October 30, 2020  
               New York, New York